WESTERN WEIGHING & INSPECTION BUREAU and another, Appellants, vs. INDUSTRIAL COMMISSION and another, Respondents.

*October 9—November 7, 1933.*

For the appellants there was a brief by *Bender, Trump, McIntyre & Freeman,* attorneys, and *Rodger M. Trump* and *Ronold A. Drechsler* of counsel, all of Milwaukee, and oral argument by *Mr. Trump.*

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

NELSON, J. The commission found "that at the time of applicant's injury he was employed by the Western Weighing & Inspection Bureau and sustained his injury while performing service growing out of and incidental to his employment by such employer." The facts are not in dispute. The finding of the commission, though denominated a finding of fact, was a mere conclusion of law. Under the rule stated in *Weyauwega v. Industrial Comm.* 180 Wis. 168, 192 N. W. 452, and *Tesch v. Industrial Comm.* 200 Wis. 616, 229 N. W. 194, we are permitted to examine the undisputed facts for the purpose of determining whether the commission's conclusion is sound.

The plaintiff Bureau is an association whose members are various railroads. It was organized in 1887. It has charge

of certain branches of railroad work such as weighing cars, inspection of freight for correct classification purposes, etc. It was organized because it was thought that the particular work intrusted to it could be more cheaply and efficiently performed by it than by the various railroads acting individually. The plaintiff Bureau employs weighmasters in various railroad centers whose principal duty is to weigh loaded cars. Prior to 1917 the weighing of carloads at Janesville was done by various men employed by the Milwaukee Railroad. Some difficulties arose out of that system. Arrangements were made by the plaintiff with the railroad whereby the former was to employ weighmasters at Janesville, carry them on the plaintiff's pay-roll, and charge all of their salaries against the railroad. Just what the agreement was does not clearly appear, but ever since such arrangement was made the wages of the weighmasters at Janesville have been paid by the plaintiff but wholly charged back to the railroad. The weighmasters were evidently employed to do the plaintiff's work and also to work for the railroad, since the weighing of cars at Janesville required only a small part of the weighmaster's time. While not engaged in weighing cars the weighmasters were subject to the orders of the railroad and required to perform its work. In 1917 Cronin applied to Mr. Johnson, an employee of the plaintiff, in charge of the Janesville district, for the position of weighmaster at Janesville. He went to see Mr. Johnson at his house a day or two before he started to work. He was told that he would have to do the weighing of the cars and would have to take orders from the railroad's yardmaster, superintendent, agent, or anybody else that telephoned from the depot. That was the way that the work was outlined to him. Cronin thereafter started to work on October 4, 1917, and continued in such employment until injured July 3, 1928. His wages were paid by the plaintiff Bureau twice a month and charged to the rail-

road. At the time the plaintiff was injured he was engaged in the performance of railroad work. He had been sent on an errand relating to the operation of the railroad. While going from his office to a point in the yard he climbed over the bumpers of certain cars standing on a track in front of his office; the cars were jolted in some manner and as a result he was thrown to the ground and injured.

The commission found that Cronin was, at the time of his injury, in the employ of the plaintiff Bureau. Both the commission and the trial court were of the opinion that this case is ruled by *Rhinelander Paper Co. v. Industrial Comm.* 206 Wis. 215, 239 N. W. 412. That case dealt specifically with the question whether the applicant therein was the employee of the paper company, the general employer, or the American Engineering Company, asserted to be the employer of a loaned employee. The Industrial Commission found that the applicant who had been employed by the paper company for a number of years was, at the time of his injury, assisting an employee of the American Engineering Company "for a few minutes in connection with ascertaining the difficulty in starting an air motor." This court held that under the facts of that case the applicant was an employee of the paper company. Mr. Chief Justice ROSENBERRY, speaking for the court, said (p. 217):

"It is quite generally agreed that in order to transfer liability from the general employer to the one to whom the employee is loaned, there must be some consensual relationship between the loaned employee and the employer whose service he enters, sufficient to create a new employer-employee relationship. Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is created. While the employee may be subject to the direction of the temporary master, he is there in obedience to the command of his employer, and in doing what the new master directs him to do he is performing his duty to the employer who gave the order. Whether or not there is in a particular case such a change

of relationship is often a matter of great difficulty and as to which reasonable minds may come to different conclusions. In this case the employment was temporary. It is clear that the claimant was performing services in obedience to the direction of the master and that there was no consent on his part, express or implied, sufficient to make him the employee of the American Engineering Company. Consent cannot be inferred merely from the fact that the employee obeyed the commands of his master in entering the services of another. It was held in the *Spodick Case* (203 Wis. 211, 232 N. W. 870) as well as in *Seaman Body Corp. v. Industrial Comm.* 204 Wis. 157, 233 N. W. 433, that there was such a consent."·

The decision of the *Rhinelander Paper Company Case* was obviously grounded on the proposition that the work being done by the applicant for the Engineering Company was "temporary," and that no consent, express or implied, sufficient to make him the employee of the Engineering Company, was shown.

The plaintiff contends that this case is ruled by *Cayll v. Waukesha G. & E. Co.* 172 Wis. 554, 179 N. W. 771, and *Seaman Body Corp. v. Industrial Comm.* 204 Wis. 157, 235 N. W. 433, in the latter of which cases it was said with reference to rules applicable to loaned employees:

"The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?"

The plaintiff contends that the undisputed facts bring the present case within the rules of the *Seaman Body Corporation Case*. If the facts of this case justified the conclusion that the applicant herein was a loaned employee, we should doubtless feel constrained to hold that this controversy is ruled by the law of that case. But we do not think that Cronin was a loaned employee.

It is our opinion that the present controversy is ruled neither by the *Rhinelander Paper Company Case* nor by the *Seaman Body Corporation Case,* but by *Murphy Supply Co. v. Industrial Comm.* 206 Wis. 210, 239 N. W. 420, decided on the same day that the *Rhinelander Paper Company Case* was decided. Many years before the applicant in the *Murphy Supply Company Case* was injured, two corporations desiring to have the services of a watchman whom neither alone could well afford to employ, entered into an arrangement under which the Morley Company was to select and hire a watchman to perform such services for both companies, each company to contribute a part of his wages. This arrangement continued for something like twenty years, during which period of time various watchmen were so employed. The applicant in that case had been employed as a night watchman for about five or six years prior to his injury. Although employed by both companies he was injured by falling into an opening in the floor while upon the premises of the Murphy Supply Company. It was there held that the applicant was at the time of his injury in the employ of the company in whose place of business he was performing services when injured. This court in refusing to follow the law of certain decisions therein cited which if followed would have supported the conclusion that both companies were liable, was influenced by the many expressions found in our decisions to the effect that the clear intent and purpose of the act is to burden the particular industry in which the injury to an employee occurs. It was there said:

"We deem the rule which seeks so far as possible to place the burden upon the particular industry in which the employee is working at the time of his injury essentially just and fair. The Morley Company was in no sense responsible for the condition in the appellant's place of business which resulted in injury to the applicant. The particular work be-

ing performed by applicant at the time of his injury was that of the appellant and was not in any sense the work of the Morley Company and may not in reason be said to be incidental to any duties which he was, under his contract with the Morley Company, to perform for it."

We think that that language is peculiarly applicable to the facts of this case. Cronin performed work for both the Bureau and the railroad for nearly eleven years. His employment was obviously not so temporary as to permit us to apply to the facts of this case the rule stated in the *Rhinelander Paper Company Case*. He was injured while performing work for the railroad and that industry should bear the burden of his injuries. The fact that the railroad was not under the workmen's compensation law at the time Cronin was injured does not justify us in holding the Bureau liable under the undisputed facts.

*By the Court.*—The judgment of the circuit court confirming the award of the Industrial Commission is reversed, with directions to enter judgment setting aside the award of the Industrial Commission.